**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

UNITED STATES OF AMERICA,          )
                                   )
v.                                 )
                                   )          Docket No. 04-cr-00136-P-S
DUNG LE, et al.,                   )
                                   )
                  Defendants.      )

**ORDER ON DEFENDANTS' MOTIONS TO SUPRESS**

SINGAL, Chief District Judge

Before the Court are the following motions to suppress:  Defendant Dung Cao's
Motion to Suppress Wire Intercept Evidence (Docket # 112) and Supplemental Motion to
Suppress Wire Intercept Evidence (Docket # 179), Defendant Dung Vu's Motion to
Suppress (Docket # 134) and Supplement to Defendant's Motion to Suppress (Docket
# 185), Defendant Nghia Nguyen's Motion to Suppress Evidence (Docket # 125), and
Defendant Dung Le's Motion to Suppress Evidence (Docket # 132).  A suppression
hearing on these motions was held over three days: April 19, 2005 and June 7–8, 2005.
After thoroughly reviewing the evidence and legal arguments of the parties, the Court
concludes that all of the above-referenced motions to suppress should be DENIED.

The defendants in this case are charged with participating in a large conspiracy to
distribute crack cocaine in the Portland area.  They were arrested and indicted after a
lengthy investigation by the Drug Enforcement Agency ("DEA") beginning in 2003.  In
their motions to suppress, Defendants challenge various actions taken by DEA agents in
their investigation of the alleged conspiracy.  Defendant Dung Le challenges the search
of the vehicle she was driving when she was stopped by Maine State Troopers on January

11, 2004, as well as her subsequent arrest and waiver of Miranda rights.  Defendant

Nghia Nguyen challenges the search of his vehicle by DEA agents after he was arrested

in a hotel parking lot on November 9, 2004.  Defendants Dung Cao and Dung Vu seek to

suppress, on various grounds, evidence obtained from a wiretap of Defendant Dung Le's

phone.  Defendant Dung Cao also seeks a <u>Franks</u> hearing to challenge the veracity of the

DEA affidavit used to obtain the wiretap.


**I.  DEFENDANT DUNG LE'S MOTION TO SUPPRESS**

Defendant Dung Le challenges her arrest by the Maine State Police and their

search of her automobile as well as her subsequent interrogation by DEA agents.

**A.      Findings of Fact**

Based on the evidentiary record before it, the Court makes the following findings

of fact:  On January 11, 2004, Dung Le and Hoang Nguyen were stopped and taken into

custody by state police as they were traveling northbound on the Maine Turnpike.  The

information relied upon by the Maine State Police in stopping and searching the car and

detaining the occupants was provided by Special Agent Paul Buchanan ("Agent

Buchanan") of the DEA who, in turn, relied upon information provided by a confidential

source. The confidential source had been working for the DEA as a paid informant for

four months and had prior convictions from the early 1980s for a variety of theft and

fraud crimes.  That confidential source had previously identified Dung Le as a leader of

the drug conspiracy, Hoang Nguyen — also known as "Jimmy" — as a participant in the

conspiracy, and Massachusetts as the source of the organization's supply of crack

cocaine.  The confidential source had also engaged in five or six controlled buys from the

conspiracy.   Much of the information provided by the confidential source was corroborated over of the course of the investigation, in part through controlled drug purchases by DEA agents and the confidential source with members of the conspiracy, including Hoang Nguyen and Dung Le.

On January 11, 2004, the confidential source informed Agent Buchanan that he had learned from Hoang Nguyen that Hoang Nguyen would be making a trip that day to Massachusetts in order to purchase crack cocaine from a supplier.   The confidential source indicated that the quantity to be purchased was between 3 and 5 ounces.   At approximately 3:00 p.m. that day, Agent Buchanan informed Trooper Kevin Curran of the Maine State Police of his belief that Mr. Nguyen, a male, was traveling to Massachusetts to purchase crack cocaine.   Agent Buchanan also informed Trooper Curran that he expected Nguyen to be driving a small white Honda with Nebraska license plate number 0AE483, suggested that there may be two or three Asian occupants of the car, possibly including females with drugs concealed in their groin areas, and warned that they might be armed. Agent Buchanan knew from prior surveillance of the conspiracy that the small white Honda was frequently driven by Mr. Nguyen although it was not registered to him.   Agent Buchanan inferred that there would be more than one occupant of the vehicle from intelligence gathered about the trips to Massachusetts and the presence of two or more co-conspirators at all controlled buys.   Agent Buchanan was told by the confidential source that he or she observed members of the conspiracy with firearms.

At approximately 3:15 p.m., after receiving notice that a car matching Agent Buchanan's description was spotted in York, Maine, Maine State Trooper Robert Brooks

spotted a car a car matching Buchanan's description in Kennebunk, Maine. The vehicle appeared to be occupied by only one person, a female. Trooper Brooks radioed for back-up, and pulled over the car upon the arrival of Trooper DeGroot and Sgt. Donovan. When Brooks turned on his blue lights, a second individual he had not seen before sat up in the passenger seat. The stop occurred between approximately 3:30 p.m. and 3:45 p.m. The Honda was stopped a good distance back from the traffic of the turnpike at a spot with good visibility.

Brooks ordered the two occupants out of the car at gunpoint but Defendant did not initially comply. When she did emerge from the car, Defendant did not follow Brooks' verbal command to turn away from him and walk backwards, requiring Brooks to physically guide her to the proper location. The driver was identified as Dung Le and the passenger as Hoang Nguyen. Dung Le was handcuffed and placed in a police cruiser.

Approximately five minutes after the initial stop, Dung Le and Hoang Nguyen were transported to the Troop G barracks by Maine State Trooper Jeffery DeGroot. Trooper DeGroot testified that he believed that Defendant was transferred to the barracks because it was a "probable cause stop." En route to the barracks, Trooper DeGroot responded to a question by Defendant as to what was going on by informing Defendant that she was in police custody. Trooper DeGroot had no difficulty understanding Defendant's English and observed no indication that Defendant did not understand his English. Defendant remained handcuffed after she arrived at the barracks and was still handcuffed when she met with Agent Buchanan at approximately 4:45 p.m.

At some point after the suspects were removed from the car but before they left the scene, Trooper Edwin Furtado began searching the white Honda. No drugs were in

plain view, but at 4:01 p.m., approximately two ounces of crack were found in a tied Walgreen's bag of rubbish in the rear passenger area. Also seized from the glove box were a copper coil commonly used to clean crack pipes and a $CO_2$ pistol under the passenger seat. A drug sniffing dog was used during the search. Because the Defendant was removed from the scene within five minutes of the stop, the Court finds that she was not present at 4:01 p.m. when the crack was discovered. After concluding the search, the vehicle was seized and towed to the State Police garage in South Portland for further inspection away from passing traffic and exceptionally cold weather conditions. No additional contraband was found in the vehicle.

At the barracks, Agent Buchanan advised Ms. Le of her Miranda rights in English and after each right, asked if she understood. She replied "yes" to each. She then indicated she wished to waive her rights. When asked how well she understood English she replied "I understand it well. In understand all of it but I don't speak it as well as I understand. I know what he was saying to me — I understand." Ms. Le then denied knowledge of drugs in the car, but subsequently admitted knowledge of the drugs and provided additional details about the purpose of her trip to Massachusetts to pick up drugs, the source of supply, the price and prior instances in which she had purchased from this source of supply, and that she was picking them up for Dung Vu.

### B.      Analysis

Defendant suggests that the initial stop of the vehicle she was driving, her detention, the search of the vehicle, and her subsequent interrogation by DEA agents were all improper, and therefore, the evidence gathered from these unconstitutional

searches and seizures should be suppressed for trial.  The Court examines each of these bases for suppression in turn.

1.    *The Stop and Search*

Defendant argues that the stop and search of her vehicle was not supported by reasonable suspicion of criminal activity.  Specifically, Defendant suggests that the DEA did not have credible information suggesting that the car would contain drugs.  In addition, Defendant suggests that Trooper Brooks' observations of the car, which appeared to contain only the female driver, did not match the description provided to him by the DEA, which suggested that there would be at least one male (Hoang Nguyen) in the car.

The Government argues that it had probable cause to stop and search the car because of the information known to Agent Buchanan about Defendant Nguyen and his planned trip to Massachusetts.   The Court concludes that evidence possessed by police at the time of the search constituted probable cause to conduct a warrantless search of the automobile.

The Supreme Court has held that "the police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained."  California v. Acevedo, 500 U.S. 565, 580 (1991).  To demonstrate the lawfulness of such an automobile search, the Government bears the burden of proving that "law enforcement officers had a belief, reasonably arising out of circumstances known to the seizing officer, that the vehicle contained that which by law is subject to seizure and destruction."   United States v. Lopez, 380 F.3d 538, 543 (1st Cir. 2004)

(citations omitted).  In undertaking this inquiry the Court must focus on "what the agents knew at the time they searched the car."  Id.

Once probable cause is found to exist, there is no need to weigh the evidence of probable cause against the privacy interests of the individual whose property was subject to search.  See id. at 544.  Neither is it necessary to apply heightened scrutiny to contraband discovered "in a container in a locked, hidden compartment" of the automobile.  Id.  The automobile exception allows "a probing search of compartments and containers within the automobile."  Acevedo, 500 U.S. at 570.  Furthermore, the relocation of a vehicle prior to the search does not affect the probable cause analysis.  Id. at 545 (citing Chambers v. Maroney, 399 U.S. 42, 52 (1970)).

In this case, police were acting based on information obtained from a confidential source that Hoang Nguyen would be traveling to Massachusetts to purchase 3 to 5 ounces of crack cocaine for distribution in the Portland area.  The confidential source had previously provided useful information to agents about the conspiracy, much of which had been corroborated.  The confidential source also participated in several controlled buys with members of the conspiracy.  The DEA also had reliable information that Nguyen would be traveling in a white Honda with Nebraska license plate number 0AE483 and that he would likely be accompanied by one or two other people.  The Court finds that the information possessed by members of the investigation at the time of the stop was sufficiently detailed and reliable to give the state troopers probable cause to believe that the northbound white Honda was returning from Massachusetts with illegal drugs.  Although Defendant makes much of the fact that Trooper Brooks only saw one occupant in the vehicle at the time he initiated the stop, Agent Buchanan's detailed

description of the car, including the license plate number, allowed Brooks to be certain that he was stopping the suspect vehicle even if there appeared to be fewer occupants that Agent Buchanan predicted.  The police had reliable information that the white Honda in question would be traveling to Massachusetts that day and transporting crack cocaine back up to Portland.  The suspect vehicle's appearance in southern Maine on the expected date headed northbound on the Maine Turnpike was sufficient to create probable cause for a stop and search regardless of the number or gender of the occupants.

Since the troopers' stop and search of the car was supported by probable cause, the search was permissible under the automobile exception to the Fourth Amendment's warrant requirement.  California v. Acevedo, 500 U.S. 565, 580 (1991).  Hence, Defendant's motion to suppress the fruits of this search must be DENIED.[1]

### 2.    *The Arrest*

The Defendant also challenges the validity of her detention by Maine State Troopers immediately following the stop of her vehicle.  At noted above, Defendant was ordered out of the car at gunpoint, handcuffed, and transported to the Maine State Police Barracks, where she was questioned by Agent Buchanan.  Defendant seeks to suppress statements she made to Agent Buchanan as the fruit of an unconstitutional arrest.  The Government argues that the initial detention of Defendant was supported by reasonable suspicion and was therefore a valid investigatory detention under Terry v. Ohio, 392 U.S. 1 (1968).  The Government suggests that the later discovery of the crack in the car created probable cause to arrest Defendant.  In the alternative, the Government argues

---

[1] Because the search was supported by probable cause, the Court need not address the Government's contentions that the search was lawful as a search incident to arrest and that the fruits of the search came within the inevitable discovery doctrine.

that police had probable cause to arrest Dung Le at the outset based on collective knowledge of the officers involved since DEA agents had previously bought drugs from her.  The Government also argues that even if the arrest was improper, the statements obtained from Dung Le after the arrest are too attenuated from the arrest to constitute fruit of the poisonous tree.

The Government's argument that the detention of Defendant is cognizable as a Terry stop is unpersuasive.  The actions taken against Defendant by the police clearly constituted a de facto arrest.  However, the Court does not find the Defendant's detention invalid because the actions of the police in detaining Dung Le were supported from the start by probable cause.

      a.    *Defendant's detention was not within the bounds of Terry v. Ohio*

Under Terry v. Ohio, 392 U.S. 1, 26 (1968), a police officer may approach a person and detain them in order to investigate possible criminal activity without probable cause. United States v. Romain, 393 F.3d 63, 70 (1st Cir. 2004).  However, the officer must have "a reasonable, articulable suspicion that criminal activity is afoot."  Id.  An "inchoate and unparticularized suspicion or hunch" of criminal activity is not sufficient to justify a stop.  United States v. Sokolow, 490 U.S. 1, 7 (1989).

The court reviewing a Terry stop "must use a wide lens and survey the totality of the circumstances."  Romain, 393 F.3d at 70.  The inquiry must consider "whether the officer's actions were justified at their inception, and if so, whether the officer's subsequent actions were fairly responsive to the emerging tableau." United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001).  A stop is justified "if the officer can point to

specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." Romain, 393 F.3d 70 (quoting Terry, 392 U.S. at 21)

While police require less justification for a Terry stop than the probable cause necessary for an arrest, the police conducting a Terry stop must be "sufficiently limited in their intrusiveness to fall outside the traditional understanding of an 'arrest.'" United States v. Acosta-Colon, 157 F.3d 9, 14 (1st Cir. 1998). There is no "litmus-paper test" to determine whether a particular detention goes beyond a Terry stop and amounts to a de facto arrest requiring probable cause. Id. Generally, "an investigatory stop constitutes a de facto arrest when a reasonable man in the suspect's position would have understood his situation, in the circumstances then obtaining, to be tantamount to being under arrest." Flowers v. Fiore, 359 F.3d 24, 29 (1st Cir. 2004). However,

> in a borderline case where the detention at issue has one or two arrest-like features but otherwise is consistent with a Terry stop, it will not be obvious just how the detention at issue ought reasonably to have been perceived. Such a case requires a fact-specific inquiry into whether the measures used by the police were reasonable in light of the circumstances that prompted the stop or that developed during the course of the stop.

Id. at 29–30.

Of course, "officers may take necessary steps to protect themselves if the circumstances reasonably warrant such measures" without transforming a Terry stop into an arrest. Id. at 30. This includes drawing weapons when reasonable, such as when officers are "faced with a report of an armed threat." Id. The First Circuit has also allowed the reasonable use of handcuffs, Acosta-Colon, 157 F.3d at 18–19, and backup officers, United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994), as the situation requires.

However, the transport of a suspect from the scene of the stop, particularly to a police station, has been held to turn a <u>Terry</u> stop into an arrest requiring probable cause. In <u>Acosta-Colon</u>, the First Circuit found that an airline passenger was placed under de facto arrest when he was "prevented from boarding his plane, placed in handcuffs, *involuntarily transported (in restraints) to an official holding area* some distance from the place of the original stop, confined to a small interrogation room and kept there under observation for more than a momentary period; yet he was never informed how long he would be detained nor told that he was not under arrest."  157 F.3d at 15 (emphasis added).   Furthermore, in <u>Dunaway v. New York</u>, the Supreme Court found that a suspect had been detained in a way "indistinguishable" from an arrest when he was

> taken from a neighbor's home to a police car, *transported to a police station*, and placed in an interrogation room. He was never informed that he was "free to go"; indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody

442 U.S. 200, 212 (1979).  Finally, in <u>Flowers</u>, the police pulled over the suspect, ordered him out the car with guns drawn, handcuffed him, placed him in a police cruiser, searched his car, and then released him.  Here, the First Circuit found that the stop "came close to line" but was not an arrest in part because police "never relocated Flowers to a police station or detention area."  359 F.3d at 31.

The First Circuit has suggested that relocation of a defendant may be permissible for "security reasons."  <u>Acosta-Colon</u>, 157 F.3d at 17.  However, "the government must point to some specific fact or circumstance that could have permitted law enforcement officers reasonably to believe that relocating the suspect to a detention room was necessary to effectuate a safe investigation."  <u>Id.</u>

11

In this case, the detention of Defendant Dung Le has all the hallmarks of an arrest. She was ordered from the car at gunpoint, handcuffed, placed in a police cruiser, and immediately removed from the scene to a police barracks.  Defendant was told that she was in police custody.  A reasonable person under the circumstances faced by the Defendant would doubtless find being "in custody" indistinguishable from being under arrest.  Furthermore, the Court has little doubt that Defendant would not have been permitted to leave at any point during the detention.  See Dunaway, 442 U.S. at 212. The Court acknowledges the validity of the security concerns that led the Troopers to point their guns at Defendant and handcuff her, and finds that the credible information provided by the confidential source that some members of the conspiracy possessed firearms justified these security precautions in the context of a Terry stop.  However, the Court finds that the removal of Defendant from the scene, particularly when combined with the Trooper's statement to Defendant that she was in police custody, transformed what might otherwise have been an investigative detention into a de facto arrest.  As noted above, transportation to a police station is a particularly coercive tactic generally requiring probable cause.  See United States v. Berry, 670 F.2d 583, 598 (5th Cir. 1982) (en banc) (suggesting that bringing a suspect to a police office effects "a marked increase in the coercive nature" of a detention).  There can be no doubt that a reasonable person in Defendant's position would have considered her situation to be tantamount to being under arrest.  See Flowers v. Fiore, 359 F.3d 24, 29 (1st Cir. 2004).  Furthermore, the Government has not demonstrated the extraordinary circumstances in this case that would allow police to transfer the suspect to a police station without arresting her.  If anything, the testimony by Trooper DeGroot suggests that security concerns were not a

12

consideration in transporting Defendant to the barracks (See Apr. 19, 2005 Hearing Tr. at 50–51 (indicating that "there were no safety issues" with traffic at the spot of the stop); June 7–8, 2005 Hearing Tr. (Docket # 193) at 9 (indicating that Defendant was removed to the barracks because "it was a probable cause stop at that point.").)

b.    *Defendant's detention was an arrest supported by probable cause*

In contrast to the Government's Terry arguments, its argument in the alternative that police had probable cause to arrest Defendant at the time of the stop is supported by the record and the applicable law.

In order to make a warrantless arrest, police must have probable cause to believe that the suspect has committed or is committing a crime.  See United States v. Watson, 423 U.S. 411, 416–18 (1976).  "Probable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts," Illinois v. Gates, 462 U.S. 213, 232 (1983), and it "must be evaluated in light of the totality of circumstances."  United States v. Torres-Maldonado, 14 F.3d 95, 105 (1st Cir. 1994).  Moreover, in order to establish probable cause, the government "need not present the quantum of proof necessary to convict."  Id. at 105.  Rather, "it need only show that at the time of the arrest, the facts and circumstances known to the arresting officers were sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense." United States v. Martinez-Molina, 64 F.3d 719, 726 (1st Cir. 1995).  "The existence of probable cause is to be evaluated on the basis of the collective information of the law enforcement officers engaged in a particular investigation." United States v. Diallo, 29 F.3d 23, 25 (1st Cir. 1994) (citations omitted).

"[P]robable cause must exist with respect to each person arrested, and a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause." Martinez-Molina, 64 F.3d at 726 (quoting Ybarra v. Illinois, 444 U.S. 85, 91 (1979)). "[S]ome additional circumstances from which it is reasonable to infer participation in [a] criminal enterprise must be shown." Id.

In this case, the Government adequately demonstrated probable cause for the arrest of Dung Le. First, although neither the DEA agents nor the state troopers had any information that Dung Le was going to be accompanying Nguyen to Massachusetts, they were aware, from their knowledge of the conspiracy's past practices, that Nguyen would likely be accompanied by at least one other member of the conspiracy. The investigators' knowledge of this practice of the conspiracy gave them a basis to arrest Dung Le that rose above "mere propinquity" to the suspect. United States v. Martinez-Molina, 64 F.3d at 726. Furthermore, the confidential source had previously identified Dung Le as a leader in the drug conspiracy and the Government presented uncontradicted testimony that both Agent Buchanan and the confidential source had made controlled purchases of crack from Dung Le prior to the arrest. These prior purchases clearly establish probable cause that Defendant committed a crime and provided investigators with an independent basis for finding probable cause to arrest the Defendant. Thus, there is no basis to suppress statements made by Dung Le to investigators as a result of the arrest.[2]

---

[2] Although the Court need not reach on the Government's attenuation argument, it notes that the short span of time between arrest and the acquisition of the "fruit" of the arrest (statements to Agent Buchanan) make it highly unlikely that the Government could succeed on this argument. See United States v. Hughes, 279 F.3d 86, 89 (1st Cir. 2002).

3.       *The Interrogation*

Defendant argues that even if her arrest was valid, her interrogation by Agent Buchanan was not because she did not voluntarily waive her <u>Miranda</u> rights due to her limited command of English.  The Government counters that Defendant speaks English sufficiently well to understand her Miranda rights.   After carefully considering the evidence before it, the Court agrees with the Government that Defendant's command of English was sufficient to allow her to voluntarily waive her <u>Miranda</u> rights.

A waiver of Miranda rights must be both voluntary, and knowing and intelligent. <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986).  A waiver is voluntary when "it [is] the product of a free and deliberate choice rather than intimidation, coercion, or deception." <u>Id.</u>  A waiver is knowing and intelligent when "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." <u>Id.</u>  Both inquiries are judged based on the "totality of the circumstances surrounding the interrogation."  <u>Id.</u>

Clearly, a waiver of Miranda rights cannot be voluntary, knowing and intelligent if the Defendant does not understand the language in which her Miranda rights are read. The First Circuit considered the voluntariness of  a non-English speaker's waiver of Miranda rights in <u>United States v. Abou-Saada</u>, 785 F.2d 1 (1st Cir. 1986).  In that case, an Arabic-speaker's claim that he could not understand English well enough to waive his Miranda rights was found not to be credible.  <u>Id.</u> at 10.  In so finding, the Court relied in part upon the fact that the Defendant was able to give coherent answers to questions by DEA agents in English, including medical details of a complicated neck injury he had suffered.  <u>Id.</u>

In this case, the Court has no difficulty concluding that Defendant is sufficiently fluent in English to understand the Miranda rights read to her by Agent Buchanan and voluntarily waive them. Defendant answered "yes" after every right that Agent Buchanan read from the DEA Form 13A in English when asked if she understood. Defendant specifically stated to Task Force Agent Sheila Wetherbee that she understood English better than she speaks it, and that she understood what Agent Buchanan was saying. Defendant then went on to provide Agent Buchanan with information regarding the conspiracy in English. Trooper DeGroot testified that he had no difficulty communicating with Defendant while transporting her to the barracks, although it appears that the interaction between them was not extensive. In addition, several recordings of monitored calls between various other parties, including Agent Buchanan and a female alleged to be Defendant were admitted into evidence. The Court finds, based on the testimony of Agent Buchanan, that the speaker in these recordings is Defendant. The Court has reviewed these tapes and finds that Defendant's conversations on the tapes demonstrate substantial fluency in English. Based on the command of English evidenced in the tapes, the Court has no doubt Defendant had little to no difficulty understanding the relatively simple language of DEA Form 13A.

The only evidence in the record that might suggest inability to understand English is the failure of Defendant to follow commands by Trooper Brooks upon being stopped. However, there are many reasons why a suspect driving a vehicle containing narcotics may be slow or unwilling to follow commands when stopped by police. In light of the other evidence that Defendant speaks and understands English reasonably well, the Court

is not convinced that Defendant's difficulty in following the Trooper's commands was due to a language barrier.

For the foregoing reasons, the Court finds that Defendant's waiver of her Miranda rights before speaking with Agent Buchanan was voluntary.   Therefore, Defendant's Motion to Suppress her statements to Agent Buchanan is DENIED.

## II.  DEFENDANT NGHIA NGUYEN'S MOTION TO SUPPRESS

Defendant Nghia Nguyen moves to suppress evidence obtained in two searches of Mr. Nguyen's automobile after his arrest by DEA agents.

### A.        Findings of Fact

Defendant was arrested with a female passenger on November 9, 2004 in the parking lot of the DoubleTree hotel in Portland.  The arrest occurred after a confidential source, co-defendant Dung Cao, set up a drug purchase with Defendant at that location in a series of recorded telephone conversations.

Dung Cao had been arrested by Agent Buchanan on November 8, 2004 after agreeing to sell crack cocaine to him.  Agent Buchanan had previously conducted a controlled buy of crack from Dung Cao on October 21, 2004.  After his arrest, Dung Cao agreed to cooperate with the DEA and implicated Nghia Nguyen as a source of supply for crack cocaine.  According to Dung Cao, Nguyen lived in Springfield, Massachusetts, and made approximately one trip per week to Maine to sell crack.  He also said that Nguyen would bring approximately a quarter of a kilogram of crack per trip, would sometimes hide crack cocaine inside his vehicle, and that Dung Cao himself had purchased crack

cocaine from Defendant Nguyen in the past.  Finally, Dung Cao told Agent Buchanan that Nguyen drove a blue Lexus with Massachusetts plates.

DEA agents also had an independent basis to suspect that Defendant was involved in the alleged drug conspiracy.  On October 9, 2004, agents intercepted a series of telephone calls between Dung Le and another member of the conspiracy Thuy Huynh, a/k/a "Jesse," pursuant to a Title III wiretap on Dung Le's telephone.  Huynh and Le arranged to meet at Dung Le's apartment at 81 Front Street in order make a transaction involving $100 of crack cocaine.  Huynh arrived at Dung Le's apartment in a blue Lexus. Police surveillance recorded the license plate information of the Lexus and later determined it to be registered to Defendant Nguyen.  One or two individuals exited the Lexus and entered the apartment.  30 to 40 minutes later, several individuals exited 81 Front Street and entered the blue Lexus.  Police surveillance followed the vehicle to the residence of a known drug user/dealer, where it dropped off an individual identified by the police as Dung Cao.  It then returned to 81 Front Street.

Dung Cao set up the drug purchase from Defendant Nguyen at the behest of Agent Buchanan in a series of recorded phone calls on November 8–9, 2004.  The phone conversations between Dung Cao and Defendant were in Vietnamese.  Dung Cao told Defendant that he wished to purchase 2–3 "eight balls" of crack cocaine.  Defendant Nguyen declined to set up a transaction on November 8 because he was not in Maine, although he said he was traveling to Maine the following day.  Cao again made a recorded call to Defendant Nguyen on November 9, 2004 at 10:00 a.m., in which Nguyen agreed to make the transaction.  In that call, Nguyen indicated that he would leave 81 Front Street to meet Cao at the Doubletree Hotel within 10 to 20 minutes.  Prior to the

telephone call, Agent Buchanan observed, through a pole camera installed at 81 Front Street, that Defendant Nguyen's blue Lexus was parked in front of 81 Front Street. At approximately 10:15, Agent Buchanan observed through the pole camera two individuals, a male and female, entering the blue Lexus and departing from 81 Front Street. Agent Buchanan and Dung Cao arrived at the Doubletree Hotel at 10:20 a.m. When Nguyen had not arrived at the Doubletree by 10:45 a.m., Agent Buchanan instructed Dung Cao to call Nguyen. In that call, Cao ascertained that Nguyen could not find the hotel. Cao gave Nguyen directions, and Nguyen arrived shortly thereafter in his blue Lexus.

The blue Lexus was occupied by a male and female. Cao identified the male as Nghia Nguyen and indicated that he did not recognize the female. Agent Buchanan also recognized the driver from the pole camera as the male entering the blue Lexus earlier that morning. After the vehicle looped around the hotel parking lot and headed back toward the exit to the street, DEA agents stopped the car and removed Defendant and the female passenger.

Defendant was transported to the DEA office. Agent Thibodeau then drove Defendant's automobile to the DEA office (approximately half of a mile away). At some point after the arrest, Agent Thibodeau found approximately four grams of crack cocaine in a cigarette box which was in an open compartment on the driver's side door. The Government's evidence is contradictory as to whether the search took place while still in the parking lot, en route to the DEA office, or in the DEA office parking lot. However, the Court finds the testimony of Agent Thibodeau credible that the search took place in the parking lot of the hotel, before the car was moved.

At the DEA office, Agent Buchanan informed Defendant that crack had been found in his car.  Agent Tully asked Defendant whether he would consent to a search. Defendant replied "Go ahead you can search it, there's nothing in there."  Just prior to this exchange, which occurred in English, a DEA-certified Vietnamese linguist telephonically read Mr. Nguyen his Miranda rights in Vietnamese.  Defendant also signed a Consent to Search Form.

The consent search that ensued revealed approximately two additional grams of crack cocaine inside a speaker on the driver's side door.[3]

### B.    Analysis

The Government seeks to justify its two searches of Defendant's car on a variety of bases, including probable cause, consent, inevitable discovery, and as a search incident to a lawful arrest.  Defendant disputes all of these bases, suggesting that police did not have probable cause to search the car, that there were no "exigent circumstances" that would justify a search incident to lawful arrest, that Defendant did not understand English well enough to consent to a search in English, and that discovery of the drugs was not otherwise inevitable.  The Court DENIES Defendant's motion, finding that there was probable cause to search the vehicle.  Because there was probable cause, arguments

---

[3] The Court notes that Agent Buchanan's affidavit accompanying the criminal complaint against Defendant stated that all 6 grams of the crack were recovered "pursuant to the consent search of the vehicle." (Criminal Complaint and Affidavit (Docket # 1) at ¶ 8.)  This is a serious discrepancy from the account provided by Agent Buchanan and the other DEA agents at the suppression hearing.  Agent Buchanan's testimony suggests he was made aware that drugs were recovered from Defendant's car by Agent Thibodeau prior to the consent search by Agent Tully only hours before he prepared his affidavit asserting that all the drugs were found pursuant to the consent search.  This discrepancy undermines Agent Buchanan's credibility and, in different circumstances, might have led the Court to discount his testimony. Fortunately for the Government, Agent Buchanan's testimony at the hearing was sufficiently corroborated on key facts by the other witness and evidence for the Court to find it credible, albeit somewhat less credible than it might have been absent this discrepancy.

concerning consent, inevitable discovery, and "exigent circumstances" justify a search incident to arrest are moot.

As discussed in Part I.B.1, supra, the Supreme Court has held that "the police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." California v. Acevedo, 500 U.S. 565, 580 (1991). To demonstrate the lawfulness of such an automobile search, the Government bears the burden of proving that "law enforcement officers had a belief, reasonably arising out of circumstances known to the seizing officer, that the vehicle contained that which by law is subject to seizure and destruction." United States v. Lopez, 380 F.3d 538, 543 (1st Cir. 2004) (citations omitted). In undertaking this inquiry the Court must focus on "what the agents knew at the time they searched the car." Id.

In Lopez, the defendant, who was arrested in his parked van during a drug sale, unsuccessfully challenged a warrantless search of his car at the police station following his arrest. The officers found drugs and a weapon in a hidden compartment under the driver's seat. Factors contributing to the court's finding of probable cause included: (1) evidence that the alleged drug sale in progress at the time of arrest occurred in a similar manner to past drug sales by the defendant that were surveilled by police, (2) evidence that the searched van was a vehicle commonly driven by the defendant, (3) the identification of the defendant by a confidential source and agents familiar with him from a prior felony conviction (4) a statement to police at the scene by the drug buyer (also arrested) that the defendant had more drugs in the car and that she believed he had hid or discarded the drugs when the police arrived (5) the alerting of a drug dog in front of the passenger seat, suggesting that drugs were present but concealed.

In this case, the evidence of probable cause is very similar to that found in <u>Lopez</u>. Agent Buchanan learned that Defendant was a seller of crack cocaine from a confidential source cooperating with authorities after his arrest on drug charges.  The confidential source had bought crack from Defendant in the past. At Agent Buchanan's request, the confidential source set up a drug transaction with Defendant in a recorded telephone conversation in which he sought to purchase 2–3 "eight balls" (approximately 7–10.5 grams) of crack cocaine.  The confidential source waited at the arranged spot for the transaction in his car with Agent Buchanan.  When a blue Lexus with Massachusetts plates pulled into agreed-upon meeting place approximately 45 minutes after the transaction was set up, the confidential source identified it as the Defendant's car and identified Defendant as the driver.  Investigators knew from their investigation that a blue Lexus was registered to the Defendant, and they had previously observed one or more unidentified individuals driving Defendant's blue Lexus to the home of a known drug dealer in order to make a purchase of crack.  Defendant was identified by agents by his Massachusetts driver's license.  No crack was found on his person, allowing a reasonable inference that crack was hidden in the car.

As in <u>Lopez</u>, the facts outlined above constitute "facts and circumstances . . . sufficient to cause a person of reasonable caution to believe the search is justified." <u>United States v. Martinez-Molina</u> 64 F.3d 719, 730 (1st Cir. 1995).  Police were reasonable in believing that the person in the car was Defendant, and that Defendant had come to the arraigned meeting place in order to sell two or three eight balls of crack cocaine to Dung Cao.  Furthermore, the fact that Agent Thibedeau's initial cursory search revealed only four grams of crack made it reasonable for the agents to believe that

additional amounts of crack were hidden elsewhere in the vehicle.  Thus, since probable cause remained for a more thorough search, it was unnecessary to obtain Defendant's consent to search the vehicle.

Accordingly, Defendant Nguyen's Motion to Suppress the crack cocaine found in his vehicle must be DENIED.

## III.  DEFENDANTS DUNG CAO AND DUNG VU'S MOTION TO SUPPRESS WIRE INTERCEPT EVIDENCE

Defendants Dung Cao and Dung Vu seek to suppress all evidence obtained from the Government's wiretap of Defendant Dung Le's telephone.  Defendants suggest that the Government failed to meet the necessity requirement, that it failed to meet the sealing requirement, and that it failed to adequately minimize calls as required by the wiretap order.  Defendant Dung Cao also avers that the affidavit by Agent Buchanan accompanying the wiretap application contains false statements and requests a Franks hearing to present evidence of these false statements.  Defendants do not challenge whether the Government showed probable cause in its application.

### A.    Background

On August, 26, 2004, the Government sought and obtained a wiretap of Defendant Dung Le's telephone line for a 30 day period.  (See Misc. Docket No. 04-57-P.)  Interceptions occurred between August 27, 2004 and September 24, 2004.  The disk containing recordings of those calls was sealed by order of the Court on September 24, 2004.

On September 24, 2004, the Government requested and received a second wiretap of Dung Le's telephone line.  That order allowed the continuation of the wiretap from September 24, 2004 to October 23, 2004.  The disk containing recordings of those calls was sealed by order of the Court on October 25, 2004.

Agent Buchanan's affidavit accompanying the initial request for a wiretap details the investigation of the Dung Le/Dung Vu crack conspiracy up to that point.  The affidavit describes a wide-ranging investigation that had succeeded in identifying and arresting members of the conspiracy in Portland, including alleged leaders Dung Le and Dung Vu, as well as out-of-state suppliers several links up the supply chain.  However, the affidavit asserts that the investigation has not revealed sources of supply, the locations of stash houses, the timing of narcotic deliveries, methods of transportation nor the movement of the drug proceeds.  Therefore, the investigation has not been able to accomplish its goal of "dismatl[ing] the entire network of individuals in Maine, New Hampshire and Massachusetts who work with Le."

The affidavit exhaustively details the normal investigative techniques used in the investigation.  The affidavit discusses three confidential informants that have been used in the investigation.  One of these, identified as CS-1, is characterized as "very helpful" until he was deactivated by the DEA due to his arrest on January 20, 2004 by state police for aggravated trafficking in a scheduled drug.  The affidavit describes five controlled purchases made from the conspiracy by CS-1.  According to the affidavit, the loss of CS-1 "crippled" the investigation.  CS-2 is characterized as a regular crack cocaine user useful only for information.  CS-3 made several controlled purchases of crack cocaine from the conspiracy, but is now somewhat compromised by his involvement in the arrests

of two co-conspirators and his close association with CS-1, whom Le and Vu know to be arrested. The affidavit asserts that none of the three cooperating sources have knowledge as to many of the details of the conspiracy.

The affidavit also discusses other investigative techniques, concluding that none offer much promise of furthering the investigation. Specifically discussed are: the use of undercover agents, the use of the grand jury, interviews of subjects or associates, physical surveillance, telephone records, pen registers, search warrants, and trash searches. Although some of these techniques were in use by investigators at the time of wiretap application, Agent Buchanan's description of their limitations and drawbacks make a convincing case that the investigation was unlikely to make progress without a wiretap.

Agent Buchanan's affidavit accompanying the second wiretap request incorporated the first affidavit by reference and includes the additional facts that Dung Cao became Dung Le's live-in boyfriend, and that Dung Le and Dung Cao had conversations concerning drugs using the target telephone.

**B.    Franks Hearing**

Defendant argues that Agent Buchanan's testimony at the hearing conducted by this Court on April 19, 2005 contradicted material statements in his affidavit in support of the government's application for wire intercept authorization. According to Defendant Dung Cao, these intentional or reckless false statements and deliberate omissions from the search warrant affidavit by Agent Buchanan require the Court to hold an evidentiary hearing to determine whether the wiretap should be deemed invalid and any evidence obtained from it suppressed.

1.       *Legal Standard*

In order to obtain an evidentiary hearing challenging the veracity of a government affidavit, Defendant must make an initial offer of proof to the Court to demonstrate that such a hearing is necessary. The standard for this showing is set forth in <u>Franks v. Delaware</u>:

> There is, of course, a presumption of validity with respect to [an] affidavit . . . . To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the . . . affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient . . . . Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the . . . affidavit to support a finding of probable cause, no hearing is required.

438 U.S. 154, 171–72 (1978). "Material omissions by an affiant are also sufficient to constitute the basis for a <u>Franks</u> hearing." <u>United States v. Parcels of Land</u>, 903 F.2d 36, 46 (1st Cir. 1990). An omission is material if its inclusion would have resulted in the denial of the wiretap application. <u>See</u> <u>United States v. Cole</u>, 807 F.2d 262, 268 (1st Cir. 1986). The <u>Franks</u> standard has been found to be applicable in the Title III context. <u>Id.</u>

2.       *The Alleged Misrepresentations*

a.       *Number of controlled buys*

Defendant Dung Cao claims in his supplemental motion that Agent Buchanan's wiretap affidavit misrepresented the number of controlled buys made during the

investigation.  Defendant points out that in paragraphs 14–19 of the affidavit, Buchanan described six controlled buys — five by the confidential source identified as CS-1 and one by Special Agent Kate Barnard.  During cross-examination at the April 19th hearing, Agent Buchanan was asked how many controlled buys were made by the confidential source identified in the affidavit as CS-1.  Consistent with his affidavit, Buchanan answered, "I believe five . . . possibly six, but I believe five." (Apr. 19, 2005 Hearing Tr. at 33)  However, later in the cross-examination, when asked about the number of controlled buys other than those by CS-1, Agent Buchanan admitted that there were "four or five controlled purchases in addition to the purchases we spoke of earlier." (Id. at 35).  Defendants claim that the affidavit does not discuss these other controlled buys, that Agent Buchanan deliberately or recklessly omitted them from the affidavit, and that had the judge been aware of these other controlled buys, he might have found that the necessity requirement was not met.

Defendant's argument is without merit simply because the additional controlled buys were not omitted from the affidavit.  In paragraphs 22, 23, and 24 of the affidavit, Agent Buchanan describes three controlled buys set up by members of the conspiracy in custody that led to the arrest of other members of the conspiracy.  In paragraph 26, Agent Buchanan describes a fourth controlled buy by CS-3 leading to the arrest of two other members of the conspiracy.  Four additional controlled buys is consistent with the "four or five" additional controlled buys testified to by Agent Buchanan.  Since the Court finds there is no discrepancy between the wiretap affidavit and Buchanan's testimony at the April 19 hearing as to the number of controlled buys, Defendant's offer of proof on this point is insufficient to warrant further proceedings.

b.     *Number of Confidential Sources*

Defendant Cao also suggests that Agent Buchanan misrepresented the number of confidential sources used in the investigation.  While the wiretap affidavit states that "law enforcement had access to three Cooperating Individuals," Agent Buchanan stated at the April 19th hearing that "there have been four [confidential sources]."  Defendant argues that the Government's failure to disclose the fourth confidential source in its wiretap affidavit may have influenced the judge's finding that other investigative techniques had been tried and failed in the investigation.  Defendant also argues that the misrepresentation was deliberate or with reckless disregard for the truth, noting that Agent Buchanan demonstrated detailed knowledge of the investigation at the hearing and was unlikely to have innocently misremembered the number of informants working on the case.

In responding to Defendant's allegation, the Government has submitted to the Court a supplemental affidavit by Agent Buchanan in which he explains that the fourth confidential source assisted in two controlled drug transactions in spring of 2003.  Those two transactions involved an Asian woman that was later determined to have ties to Dung Le's drug trafficking activities.  However, Agent Buchanan doubts that the confidential source would have ever become a trusted member of the organization.  Furthermore, in July 2003 the confidential source was removed from the State of Maine by the DEA for safety reasons connected with the confidential source's role in an unrelated drug investigation.

Based on the statements in Agent Buchanan's supplemental Declaration, it is clear to the Court that Defendant's offer of proof fails to meet the materiality requirement. The confidential source provided only minor assistance to the investigation in its early stages and had been removed from the state for safety reasons at the time the wiretap application was submitted. Although in the interests making a "full and complete statement," <u>see</u> 18 U.S.C. § 2518(c), the wiretap affidavit ought to have mentioned this source, such information would not have altered the necessity analysis undertaken by the Court. If anything, a discussion of this fourth confidential source in the wiretap application would have bolstered the Government's case that normal investigative techniques had been unsuccessful in revealing the full extent of the conspiracy.

At the suppression hearing, counsel for Defendant Dung Cao requested the opportunity to cross-examine Agent Buchanan regarding his declaration accompanying the Government's Response. The Court sees no need for further proceedings in this matter. Agent Buchanan's credibility was extensively tested during the course of the three day suppression hearing. Further cross-examination of Agent Buchanan at this point would be redundant and unilluminating.

Since the fourth cooperating source omitted by Agent Buchanan in his wiretap affidavit had only a small role in the investigation and was not available to further the investigation at the time of the application, the Court finds that Defendant's offer of proof is insufficient since Defendant clearly cannot show that the omission was material.

In addition, Defendant has failed to make an adequate offer of proof as to the reckless or deliberate nature of Agent Buchanan's omissions. Defendant's argument that the existence of two misrepresentations in the affidavit suggests deliberateness is belied

by the fact that one of the two allegations of misrepresentation by Defendant is clearly baseless.  See Part III.B.2.a, supra.  Thus, Defendant's only support for this otherwise conclusory allegation is that Agent Buchanan has demonstrated detailed knowledge of this case through his testimony at the April 19 hearing.  While Agent Buchanan may have demonstrated such detailed knowledge, this does not establish a credible motive for Agent Buchanan to lie.  As discussed above, the inclusion of the fourth confidential source in the wiretap affidavit would likely have helped rather than hurt the Government's case for a wiretap.  In addition, it is unlikely that Agent Buchanan would have made a deliberate misrepresentation on the wiretap affidavit in order to get a favorable ruling only to go out of his way to contradict his false statement at the hearing.  (See Apr. 19, 2005 Hearing Tr. at 33.)  Thus, the Court finds that, in addition to failing the materiality test, Defendant's offer of proof fails to assert more than conclusory allegations that the omission was deliberate or reckless.

Due to the weakness of Defendant's offer of proof, the Court DENIES Defendant's request for a Franks hearing.


### C.      The Necessity Requirement

The Court turns to Defendants' allegations that the two wiretap affidavits do not support the issuing Judge's conclusion that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or are too dangerous.

18 U.S.C. § 2518(1)(c) requires that each application for interception of wire communications include "a full and complete statement as to whether or not other

investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  This provision, known as the necessity requirement, "was designed to assure wiretapping is not resorted to in situations where the traditional investigative techniques would suffice to expose the crime." <u>United States v. Rivera-Rosario</u>, 300 F.3d 1, 18 (1st Cir. 2002).

The necessity requirement does not require the Government to show an absolute impasse in the investigation.  According to the First Circuit:

> [T]he government is not required to show that other investigatory methods have been completely unsuccessful, nor is the government forced to run outlandish risks or to exhaust every conceivable alternative before resorting to electronic surveillance. It is only required to show that it has made a reasonable good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls.

<u>Id.</u> at 19 (citations omitted).  In reviewing the authorization of a wiretap, the Court must test the application in a "practical and commonsense manner to determine whether the facts which it sets forth are 'minimally adequate' to support the findings made by the issuing judge." <u>Id.</u> at 19 n.23 (quoting <u>United States v. Cole</u>, 807 F.2d 262, 268 (1st Cir. 1986)).  The inquiry is not "rigid or rule-oriented; to the precise contrary, Title III demands a practical, common sense approach to exploration of investigatory avenues and relative intrusiveness." <u>United States v. David</u>, 940 F.2d 722, 728 (1st Cir. 1991). Furthermore, "[b]ecause drug trafficking is inherently difficult to detect and presents formidable problems in pinning down the participants and defining their roles, investigative personnel must be accorded some latitude in choosing their approaches." <u>Id.</u>

Defendants argue that the considerable success described by Agent Buchanan in his affidavit in investigating the conspiracy cuts against a showing of necessity.  While this does raise questions as to whether traditional techniques have "been tried and failed,"

the law also allows for wiretaps when traditional methods "reasonably appear to be unlikely to succeed." 18 U.S.C. § 2518(1)(c). In a large drug conspiracy, it is possible for agents to have a great deal of success investigating the conspiracy using traditional methods yet still find it difficult or impossible to penetrate the full scope of the conspiracy without a wiretap.

In Rivera-Rosario, Defendant made a similar argument regarding the apparent success of investigators of investigating a large-scale drug ring. In rejecting the Defendant's argument, the First Circuit reasoned:

> Though the government's less intrusive methods had provided some valuable assistance in the investigation, much of the conspiracy's scope and dealings were still undisclosed. Specifically, the government was still unaware of the identity of many of the conspiracy's members and the supplier of its drugs. Moreover, at the time of the application, the government had no real knowledge of the organizational structure of the drug conspiracy. Under these circumstances, it was sensible for the district court to allow the government to employ electronic surveillance in order to uncover the complete range of operations of the target organization.

Rivera-Rosario, 300 F.3d at 19. In this case, as in Rivera-Rosaro, the Government asserts that although it used pen registers, telephonic records, closed-circuit video surveillance, physical surveillance, undercover agents, and monitored calls, the conspiracy's scope and dealings remained undisclosed. The tightly joined units of Dung Le's apartment complex limited the ability of the DEA to conduct physical surveillance of Dung Le's residence. Moreover, Agent Buchanan felt that use of search warrants, too much physical surveillance, or grand jury subpoenas could compromise the investigation and lead to flight. The Government also suggested that even after the arrest of several suppliers, it was clear to the agents that Dung Le and her associates continued to obtain and distribute crack, and therefore, the wiretap was necessary to further the investigation.

The investigation's use of three different cooperating sources to investigate the conspiracy was only partly effective.  CS-1 was arrested during the investigation and deactivated; CS-2 was of limited usefulness because of an ongoing drug addiction.  CS-3 was being used successfully to make controlled buys, but, in addition to the problems described above, was thought to be impeachable in court.  DEA agents felt they needed additional evidence to corroborate the testimony of this cooperating source. Corroboration of informants subject to impeachment at trial is a valid basis for a wiretap. See United States v. Kelley, 140 F.3d 596, 601 (5th Cir. 1998).

Given the convincing evidence of necessity set forth by Agent Buchanan in his wiretap affidavit, the Court sees no basis for questioning the sound judgment of the issuing judge in granting the two wiretap applications.


**D.  Minimization of Calls.**

Defendant Dung Vu argues that many of the calls intercepted by agents pursuant to the two wiretaps of Dung Le's phone were not properly minimized.  Defendant has provided the Court with a list of calls that he alleges were not properly minimized by the Government.   Defendant argues that the Government's failure to properly minimize these calls constitutes a violation of the Court's wiretap order and seeks suppression of all evidence obtained through the wiretap.

The requirement of minimization is set forth in 18 U.S.C. § 2518(5): "Every order and extension thereof shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter."   The minimization requirement

"spotlights the interest in confining intrusions as narrowly as possible so as not to trench impermissibly upon the personal lives and privacy of wiretap targets and those who, often innocently, come into contact with such suspects."  United States v. Lopez, 300 F.3d 46, 57 (1st Cir. 2002)

"When fulfilling its obligation to minimize unauthorized communications, the government is held to a standard of honest effort; perfection is usually not attainable, and is certainly not legally required."  Id.  Courts should conduct "an objective assessment in light of the facts and circumstances known to the government at the relevant points in time."  United States v. London, 66 F.3d 1227, 1236 (1st Cir. 1995).  Factors for the courts to consider in reviewing minimization challenges include "1) the nature and complexity of the suspected crimes; 2) the thoroughness of the government's precautions to bring about minimization; and 3) the degree of judicial supervision over the surveillance process."  Lopez, 300 F.3d at 57.  Also, "where an investigation involves a drug ring of unknown proportion . . . the need to allow latitude to eavesdroppers is close to its zenith."  United States v. Charles, 213 F.3d 10, 22 (1st Cir. 2000).

In most cases, the proper remedy for failure to minimize is the suppression of the call in question, not the wiretap evidence in its entirety.  "Total suppression of electronic surveillance evidence is not appropriate unless the moving party shows that there was a taint upon the investigation as a whole sufficient to warrant such sweeping relief. Errors in minimizing one particular interception within the context of a lengthy and complex investigation . . . do not automatically warrant the suppression of all the evidence obtained through electronic surveillance."  United States v. Baltas, 236 F.3d 27, 32 (1st Cir. 2001).

34

This case involves the investigation of a complicated drug conspiracy that included unidentified participants in multiple states, use of code words, the movement of money between family members within and outside the United States, and the passing of the target telephone to multiple individuals in one conversation.  In addition many of the interceptees have criminal, personal social and familial relationships, resulting in phone conversations that could veer between drug trafficking and personal matters.  As such, the Government is entitled to significant latitude in eavesdropping on calls that might not initially appear related to the conspiracy.

Furthermore, Agent Buchanan's affidavit demonstrates that the Government took precautions to ensure compliance with the Court's wiretap order generally and its instructions on minimization specifically.  According to Agent Buchanan, a Government attorney conducted special training for "all supervising agents, monitors and others" involved in the wiretap of Dung Le's phone.  The training included information on the importance of minimization.  All monitors and other individuals at the minimization training were required to sign a declaration asserting that they had read and were familiar with the written instructions by the Government attorney, Agent Buchanan's wiretap affidavit, and the Court's order authorizing the wiretap.

In his supplemental motion, Defendant Vu lists 443 calls that he alleges should be been minimized, as well as a number of calls that were either insufficiently minimized or mischaracterized in Agent Buchanan's Declaration (Docket # 160).  Since a total of 3,308 completed calls were intercepted during the course of the wiretap, Defendant Vu is alleging that the Government improperly failed to minimize approximately 13.4 percent of completed calls.  Since the Government actually minimized only 226 calls, or 6.8

percent of all completed calls, Defendant essentially accuses the Government of failing to minimize 66.2 percent of calls that ought to have been minimized.

While a 66.2 percent failure rate, if proven, might call into question whether the Government has undertaken an "honest effort" to minimize calls, Defendant has not made an adequate showing to the Court that the Government should have minimized these 443 calls. The Court cannot accept at face value Defendant's unsubstantiated assertion that these calls were unrelated to the investigation. In short, in order to prevail on minimization, either to suppress the wiretap in its entirety, or even to suppress specific calls, the Defendant must produce more than list of calls. Some showing must be made as to <u>why</u> the calls should have been minimized by the Government.

Because the Defendant has failed to demonstrate anything less than an honest effort on the Government's part in minimizing intercepted calls, the Court DENIES his Motion to Suppress.

### E. Sealing of the Tapes

Finally, Defendant Cao argues that the Government failed to properly seal wiretap recordings at the expiration of the wiretap. This argument is without merit.

18 U.S.C. § 2518 provides that "immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions."

It appears entirely clear from the docket (Misc. Docket # 04-57-P) that the tapes were properly sealed in this case. The first tape was sealed on September 24, 2004, prior

to expiration of the wiretap.  The second tape was sealed on October 25, 2004, the first weekday after the expiration of the wiretap on Saturday, October 23, 2004.

## IV.  CONCLUSION

For the foregoing reasons, the Court DENIES following Motions to Suppress: Defendant Dung Cao's Motion to Suppress Wire Intercept Evidence (Docket # 112) and Supplemental Motion to Suppress Wire Intercept Evidence (Docket # 179), Defendant Dung Vu's Motion to Suppress (Docket # 134) and Supplement to Defendant's Motion to Suppress (Docket # 185), Defendant Nghia Nguyen's Motion to Suppress Evidence (Docket # 125) and Defendant Dung Le's Motion to Suppress Evidence (Docket # 132).

SO ORDERED.

/s/ George Z. Singal
Chief U.S. District Judge

Dated this 24th day of June, 2005.